## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| Haley Muse, individually, and on behalf of all others similarly situated, | |
| *Plaintiff*, | Case No. 3:24-cv-3763 |
| v. | |
| Dreamland Baby Company, | **CLASS REPRESENTATION** |
| *Defendant*. | **JURY TRIAL DEMANDED** |

Plaintiff Haley Muse ("Plaintiff"), individually, and on behalf of all others similarly situated, brings this action against Defendant Dreamland Baby Company ("Dreamland" or "Defendant"). Plaintiff brings this action by and through her attorneys, and alleges, based upon personal knowledge as to her own experiences and actions, and based upon information and belief and reasonable investigation by her counsel as to all other matters, as follows:

### I.    INTRODUCTION

1.    The Dreamland Baby Company manufactures, markets, and sells weighted sleep products for infants and toddlers, including blankets, swaddles, and "sleep sacks" (the "Products").

2.    Dreamland's Products were unique when first brought to market. The Products are significantly heavier than traditional infant bedding and sleep aids (for example, the weighted blanket weighs 4 pounds) due to beads sewn into the Products' fabric and purportedly distributed evenly throughout. Dreamland began to mass-market its weighted sleep sack in 2020, and introduced the weighted blanket and weighted swaddle not long thereafter, though copycats soon followed.

3.     Dreamland claims on product packaging and in product marketing that the Products reduce infants' stress and increase their relaxation, thereby inducing longer and deeper sleep, because the Products' added weight provides "deep touch stimulation" that relaxes the nervous system by simulating the feeling of being embraced.

4.     Critically, given the trepidation and concern typical of new parents, Dreamland also touts the Products as safe, effective and meeting the highest quality standards.[1] Dreamland contends it "enlisted the help of professionals in the field of sleep, medicine, infant care, and occupational therapy to provide us with their expert guidance and ensure that we continue to deliver safe, effective products that meet the highest quality standards!"[2] It leverages its safety claims, which are material to any reasonable purchaser, across marketing channels and on product packaging, on which Dreamland uniformly claims the Products are "Safety Certified" and "Doctor Approved."

5.     Despite Dreamland's claims, however, the medical community has for some time expressed concern over the use of the Products. Beyond doubts concerning the Products' efficacy and performance, many medical experts assert the Products and others like them are downright dangerous. Specifically, doctors have for some time warned that weighted sleep sacks and swaddles make it difficult for babies to rouse themselves from sleep or move in response to hazards, like a lack of oxygen, thus increasing the risk of sudden infant death syndrome (SIDS).

6.     In response to the concerns raised by the medical community and reports linking multiple infant deaths to weighted sleep aids, in July 2022 the American Academy of Pediatrics ("AAP") released a report concluding that weighted sleep products are unreasonably dangerous.

---

[1] https://web.archive.org/web/20240501184404/https://dreamlandbabyco.ca/pages/safety (archived snapshot from May 1, 2024) (last visited June 14, 2024).
[2] https://dreamlandbabyco.com/pages/medical-expert (last visited June 17, 2014).

The AAP also updated its safe sleep guidelines to recommend against the use of weighted sleep aids like the Products due to documented safety concerns.

7.      In 2023, the AAP, with the availability of new data, doubled down and urged the United States Consumer Product Safety Commission ("CPSC") to recall weighted sleep aids, including the Products, due to the unreasonable safety risks to which they subject infants. The Center for Disease Control ("CDC") and the National Institute of Health ("NIH") reached similar conclusions and likewise urged parents to cease using weighted sleep aids with infants and young children.

8.      In April 2024, the CPSC finally released a statement warning parents about the dangers of these products. In response, many retailers such as Target and Amazon pulled the Products and competing offerings from their shelves and issued recalls and offered refunds for Products previously sold through their stores

9.      Dreamland, one of the largest manufacturers of weighted sleep aids, nevertheless continues to market and sell its products as safe. However, the weight of publicly available evidence makes clear that Dreamland and other manufacturers long have deceived and misled customers about the safety of the Products – products intended for infants – in an effort to induce consumers to purchase them at a premium over traditional infant bedding and sleep aids.

10.     As a result of Defendant's unfair, deceptive and/or fraudulent business practices Plaintiff and other consumers who purchased the Products have suffered an injury in fact, ascertainable loss of money and/or property and/or loss in value. The unfair and deceptive trade practices committed by Defendant were conducted in a manner giving rise to substantial aggravating circumstances. But for Defendant's many misrepresentations and omissions

concerning the Products' safety, Plaintiff and Class members would not have purchased the Products.

11.    As a direct result of Defendant's wrongful conduct, Plaintiff and members of the Class have been harmed and are entitled to actual damages, including damages for the benefit of the bargain they struck when purchasing the Products, statutory damages, attorneys' fees, costs, restitution, and injunctive and declaratory relief.

12.    Accordingly, Plaintiff brings this action to redress Defendant's violations of the California Consumer Legal Remedies Act, the California False Advertising Law, the California Unfair Competition Law, and other state consumer protection acts, for breach of express and implied warranty, and, and for restitution under quasi-contract.

## II.    PARTIES

13.    Plaintiff Haley Muse is a citizen of St. Peters, Missouri. Plaintiff Muse is the mother of an infant child. In December 2023, Plaintiff Muse purchased one Baby Bamboo Pajamas with DreamCuffs and two Dream Weighted Transition Swaddles from Defendant's online store for $119.93. Before purchasing the products, she carefully reviewed the information contained on Dreamland's website and she paid particular attention to Defendant's assurances about the products' safety. Plaintiff Muse dressed her infant child in Defendant's products, wholeheartedly believing Defendant's representations about their safety. Plaintiff Muse immediately ceased dressing her infant with the products after viewing media reports about safety concerns. Plaintiff Muse would *never* have purchased Defendant's products and dressed her infant child in them if she knew they were unsafe. As a parent, Plaintiff Muse is distraught and upset that she may have brought harm to her infant child by purchasing and using Defendant's products.

14.     Defendant Dreamland Baby Company is a California corporation with its headquarters located at 3383 Deer Hollow Dr., Danville, CA 94506.

### III.    JURISDICTION AND VENUE

15.     This Court has subject-matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d)(2), because this is a class action in which the matter in controversy exceeds the sum of $5,000,000, the number of class members exceeds 100, and at least one Class member is a citizen of a state different from Defendant. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) because all claims alleged herein form part of the same case or controversy.

16.     This Court has personal jurisdiction over Defendant because Defendant is headquartered in California.

17.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's and Class members' claims occurred in this District and because Defendant resides in this District.

### IV.    FACTUAL ALLEGATIONS

**A.     Dreamland Baby Company invented weighted infant sleep products and "created" the market for weighted infant sleep products.**

18.     Tara Williams, the founder and CEO of Dreamland, conceived weighted sleep products for infants when she was "sleep-deprived, stressed, and desperate for help" due to her fourth baby, Luke, constantly waking up at night, when she suddenly discovered that Luke "instantly calmed down" after she placed a "heavy throw blanket" on top of him.[3]

---

[3] https://web.archive.org/web/20240225142430/https://dreamlandbabyco.com/pages/our-story (archived snapshot from February 25, 2024) (last visited June 17, 2024). Dreamland has recently

19.     After this discovery, Ms. Williams spoke to her mother-in-law, who promptly created what would become the Dreamland Baby prototype: a weighted wearable sleep sack.[4] Ms. Williams claims that on Luke's first night wearing this prototype, he "slept 12 hours!"[5]

20.     In May 2019, Ms. Williams launched a Kickstarter campaign to begin selling her invention to other parents, which raised $24,541.[6] After the successful campaign, Ms. Williams delivered the product to her backers and launched an ecommerce store where she began selling her products.[7]

21.     In Spring of 2020, Ms. Williams appeared on *Shark Tank* (a TV show where inventors and entrepreneurs pitch their ideas, products, and small businesses to venture capitalists for partnership and investment) to pitch the Dreamland Baby Co. and its products, and successfully struck an investment deal with investor-host Lori Greiner.[8]

22.     Dreamland then negotiated distribution deals with Nordstrom, Bloomingdales, Target and other major retailers throughout 2020 and 2021, and ended 2021 with 10 million dollars in revenue.[9]

---

deleted the "our story" section of its webpage, which used to be featured prominently. *See* https://dreamlandbabyco.com/pages/our-story.

[4] *Id.*

[5] *Id.*

[6] https://www.kickstarter.com/projects/dreamlandbaby/dreamland-baby-weighted-swaddle-and-sleep-sack-for-your-baby (last visited June 17, 2024).

[7] *Id.*; https://web.archive.org/web/20240225142430/https://dreamlandbabyco.com/pages/our-story. (last visited June 17, 2024).

[8] *Id. See also* https://www.prnewswire.com/news-releases/shark-tank-alum-dreamland-baby-reaches-10-000-000-in-revenue-301434193.html#:~:text=After%20a%20successful%20Kickstarter%20and,get%20the%20sleep%20they%20need!

[9] https://www.prnewswire.com/news-releases/shark-tank-alum-dreamland-baby-reaches-10-000-000-in-revenue-301434193.html#:~:text=After%20a%20successful%20Kickstarter%20and,get%20the%20sleep%20they%20need!

**B.    Defendant advertised its weighted sleep products as safe and effective sleep aids for children.**

23.    Dreamland currently sells weighted infant blankets, weighted baby swaddles, and weighted sleep sacks for children by heavily promoting its claims regarding product safety.[10]



**Figure 1**.[11]

24.    Dreamland claims its products "naturally reduce[] stress and increase[] relaxation through the power of deep touch stimulation" and that the weighted nature of its products "give[s] your baby the sensation of being hugged." And according to Dreamland, this sensation of being hugged makes babies "feel more secure, which helps babies feel calm so they can fall asleep faster and stay asleep longer."[12]

25.    Dreamland further claims, "[a]s your baby gets used to the gentle weight, she will form a positive sleep association with the weighted sleep sack. Each time she sees Dreamland

---

[10] https://dreamlandbabyco.com/collections/sleep-sacks-swaddles-and-blankets (last visited June 12, 2024)
[11] *Id.*
[12] https://dreamlandbabyco.com/pages/faq (last visited June 13, 2024)

Baby, it will serve as a sleep cue, signaling that it's time to go to bed, whether that's nap time or nighttime." [13]

26.    Since its inception, Dreamland has also emphasized the safety of its products. For example, safety is heavily featured on the Kickstarter page that helped launch the company:

---

[13] *Id.*

## Safety, backed by Science ─────────

Dreamland Baby's wearable weighted blankets are designed in partnership with pediatricians, NICU nurses and certified sleep consults.

Dreamland Baby is **Safety Certified**, has exceeded all United States Consumer Product Safety Commission standards,  and is recognized by the **International Hip Dysplasia Institute** as a hip-healthy product.



A parent's hug is scientifically proven to soothe. Dreamland Baby's gentle weight mimics this touch leading to improved mood, relaxation and ultimately sleep.

Many Neonatal Intensive Care Units (NICUs) use weighted components to calm babies and promote deep, restful sleep. The gentle weight provides near-instant comfort and relief.

Weighted blankets have been used for adults and children for many years. Infants now have the opportunity to safely get the same incredible sleep and relaxation through Dreamland Baby's wearable weighted blankets.

**Figure 2**.[14]

27.     And as demonstrated in the figures below, Dreamland prominently emblazoned the phrases "Safety Certified," "Doctor Approved," and "Proven Effective" all over its product packaging, and further asserts on the back of its product packaging that its products "[p]assed all safety testing and additional non-required testing," albeit without disclosing what those safety tests are, describing how they support Dreamland's safety claims, or explaining how the tests ensure the Products are safe for use.

---

[14] https://www.kickstarter.com/projects/dreamlandbaby/dreamland-baby-weighted-swaddle-and-sleep-sack-for-your-baby/description (last visited June 17, 2024)



**Figure 3**.[15]



**Figure 4.**[16]



**Figure 5**.[17]

28.     Dreamland trades on the praise and acclaim received from popular publications which are primarily aimed at parents or middle-aged adults, and prominently feature logos of these publications front and center on its website:

---

[17] https://goodbuygear.com/cdn/shop/products/516bb83f-82ca-4490-bcff-df10e7d070d1_1024x1024.png?v=1681402170 (last visited June 15, 2024)



**Figure 6**.[18]

29.    Dreamland's website also prominently features a section titled "BACKED BY SCIENCED [*sic.*]," according to which Dreamland claims to have "enlisted the help of professionals in the field of sleep, medicine, infant care, and occupational therapy to provide us with their expert guidance and ensure that we continue to deliver ***safe***, effective products that meet the highest quality standards!"[19] The same page features profiles for, *inter alia*, an AAP Board-certified Pediatrician, a NICU registered nurse, a pediatric audiologist, and a certified toddler sleep consultant, all of whom Defendant claims participated in the development of Dreamland's various products.[20] And as detailed above, Dreamland emphasizes these very same claims on product packaging, ensuring purchasers like Plaintiff and other Class members are made aware of Defendant's safety claims.

30.    Until recently, Dreamland also included a discussion of safety in its FAQ section:

---

[18] https://dreamlandbabyco.com (last visited June 17, 2024).
[19] https://dreamlandbabyco.com/pages/medical-expert (emphasis added) (last visited June 13, 2024)
[20] *Id.*

14

| Is Dreamland Baby® safe? | ⌃ |
|---|---|

Safety is our number one priority. As a mom-owned business, nothing is more important to us, which is why we partnered with pediatricians, NICU nurses, and certified sleep consultants when developing our weighted sleep sacks.

Our products exceed all U.S. Consumer Product Safety Commission standards and we use only natural and non-toxic materials. The International Hip Dysplasia Institute acknowledges the Dreamland Baby Weighted Swaddle as a "hip-healthy" product when used as directed.

We also pulled research from this clinical study demonstrating that weighted blankets are safe for newborns, significantly increase calm feelings, and improve sleep patterns. You can learn more about our commitment to safety here. With over 500,000 products sold, we have never had an adverse event caused by our products.

**Figure 7.**[21]

31.     Curiously, however, Dreamland recently has reworked its FAQ section to remove all references to the word "safety."

32.     As recently as May 1, 2024, Dreamland also had a dedicated section on its website in which it touted the safety of its Products.[22] On this page, under a heading titled "Dedication to Safety," Dreamland claimed that it "has exceeded all United States Consumer Product Safety Commission standards. We use 100% natural, soft cotton. Our fabrics are not treated with flame retardant. The inner poly pellet beads are non-toxic. We source only the best materials for ultimate comfort and safety. […] Our products are rigorously tested with both required and non-required testing. We ensure high quality standards and safety in every aspect of our products[,]"[23] and identified some of the tests it conducted as shown in Figure 8 below. This entire section of its website has since been deleted.

---

[21] https://web.archive.org/web/20230808075326/https://dreamlandbabyco.com/pages/faq-producty-safety-and-care (archived snapshot from August 8, 2023) (last visited June 18, 2024).
[22] https://web.archive.org/web/20240501184404/https://dreamlandbabyco.ca/pages/safety (archived snapshot from May 1, 2024) (last visited June 14, 2024).
[23] *Id.*

Procedures Performed

## TESTING

• LEAD (METAL)
• LEAD (NON • METAL)
• LEAD (SURFACE COATING)
• PHALATES
• COLORFASTNESS
• FLAMMABILITY OF CLOTHING TEXTILE
• PHILING RESISTANCE
• DIMENSIONAL CHANGES - HOME LAUNDERING
• COLORFASTNESS TO LAUNDERING
• THERMAL TRANSMITTANCE
• SHARP EDGES
• SHARP POINTS
• SMALL PARTS: CHOKING HAZARD
• SMALL PART: USE & ABUSE: TORQUE & TENSION
• SUFFOCATION HAZARDS
• TRACKING LABELS FOR CHILDREN'S SLEEPWEAR
• SIZE VERIFICATION OF CHILDREN'S SLEEPWEAR

**Figure 8**.[24]

33.     Dreamland also previously claimed that its Products "Exceed[ed] CPSC Standards" and possessed the following certifications: International Hip Dysplasia Institute "Hip-Healthy Product" certification, First Candle's[25] "First Candle Safe Sleep Guardian" participation, and Oeko-Tex's Standard 100 Label (which certifies that the textiles used in the product are harmless to human health).[26]

34.     Critically, however, Dreamland does not appear on First Candle's list of supporters and partners.[27] Furthermore, the "Safe Sleep Guardian" program is not a product certification program at all, but a program to promote safe baby sleep habits in social media and advertising. Participants in this program pledge to only post images of babies in safe sleep positions

---

[24] *Id.*
[25] First Candle is a non-profit organization dedicated to studying and preventing SIDS.
[26] https://web.archive.org/web/20240501184404/https://dreamlandbabyco.ca/pages/safety (archived snapshot from May 1, 2024) (last visited June 14, 2024).
[27] https://firstcandle.org/ (last visited June 17, 2024).

on social media and advertising.[28] Nor has the CSPC ever *set* safety standards applicable to weighted sleep aids, let alone confirmed that Defendant's Products exceed them.

35.    Dreamland markets its Products in this manner and seeks to have them profiled in magazines and other publications read by new and expecting parents because it knows that safety is a critical consideration to its target demographic, and that Defendant's safety claims are material to the average purchaser. Indeed, there are hundreds of websites devoted to studying and confirming the safety of products intended for use with young children precisely because safety is material to new parents' purchasing decisions.

36.    Dreamland thus establishes substantial credibility with consumers by highlighting positive press coverage and emphasizing the involvement of purported scientific experts. This established credibility, in turn, would lead a reasonable consumer to believe Dreamland's claims that its weighted sleep products are effective and safe.

**C.    Experts confirm weighted sleep products are ineffective and dangerous.**

37.    On March 13, 2020, ASTM International ("ASTM") began efforts to establish design and weight standards for the Products through its product subcommittee.[29] It is notable that the subcommittee was co-chaired by none other than Tara Williams herself.[30]

38.    ASTM is a broad organization that develops and publishes standards and technical specifications on a wide variety of materials and products with input from industry players, regulators, and the public. ASTM adopts these *voluntary standards* by votes from industry players

---

[28] https://firstcandle.org/safe-sleep-
guardians/#:~:text=By%20committing%20only%20to%20post,helping%20us%20save%20babie
s'%20lives. (last visited June 17, 2024).
[29] https://www.astm.org/workitem-wk72273 (last visited June 17, 2024).
[30] https://www.wsaz.com/video/2024/06/10/defective-baby-industry-insiders-questioned-over-involvement-with-setting-own-safety-standards/.

and regulators. The CPSC often adopts the voluntary standards in its regulation of products. And for certain products, including toys and baby products, the CPSC *must* adopt the standards established by the ASTM.

39.    The CPSC rejected (cast a negative ballot on) ASTM's proposed voluntary standards for the Products on multiple occasions, citing NIH and CDC concerns that weighted blankets are unsafe for infants and other young children.[31] The CPSC also strongly recommended that any proposed weight standards, specifically the weight concentration limits over a 10.6 square inch area (which represents the chest area of an average infant), be scientifically proven as safe.[32]

40.    The AAP has also spoken out against ASTM's attempt to establish standards, stating that establishing standards inherently "send[s] parents and caregivers the incorrect message that these unnecessary products are safe." [33]

41.    As of the date of this complaint, ASTM still has not established a set of standards for the Products.[34]

42.    Furthermore, ASTM's attempt to set standards for the Products was itself mired in controversy because Tara Williams was co-chair of the subcommittee seeking to establish standards for these products. As the founder and CEO of Dreamland Baby Co., Ms. Williams' position on the subcommittee raised serious conflict-of-interest concerns.[35]

---

[31] https://www.cpsc.gov/s3fs-public/CPSC-Staff-Comments-on-Wearable-Infant-Blankets-Swaddles-Ballot-ASTM-F15-19-23-03.pdf?VersionId=C171nuNDVDRo4SOdCZmAN5_hPlaC9GRp (last visited June 13, 2024).
[32] *Id.*
[33] https://www.wsaz.com/video/2024/06/10/defective-baby-industry-insiders-questioned-over-involvement-with-setting-own-safety-standards/.
[34] https://www.astm.org/workitem-wk72273 (last visited June 17, 2024).
[35] https://www.wsaz.com/video/2024/06/10/defective-baby-industry-insiders-questioned-over-involvement-with-setting-own-safety-standards/

43.    The AAP has firmly and continuously recommended against using the Products on infants. And in 2022, the AAP updated its *Recommendations for Reducing Infant Deaths in the Sleep Environment* to state that "weighted blankets, weighted sleepers, weighted swaddles, or other weighted objects [should] not be placed on or near the sleeping infant" and declared that "[w]eighted swaddle clothing or weighted objects within swaddles are not safe and therefore not recommended."[36]

44.    The U.S. Center for Disease Control likewise ruled that "[p]roducts labeled as weighted – including weighted sleepers, swaddles, sleep sacks, and blankets – are **not safe** for infants" and recommended against their use.[37]

45.    Despite these recommendations from the AAP, CDC, and other medical and government bodies, Defendant continued to market and sell the Products, which continued to gain popularity. In response, the AAP penned a letter to the United States Consumer Product Safety Commission, strongly calling for agency action to regulate the Products.[38]

46.    In its letter, the AAP pointed out that the available evidence does not "demonstrate that [weighted sleep products] are effective in helping babies sleep longer or with fewer disruptions." And, after reaffirming its 2022 recommendation against the Products, the AAP raised serious concerns, based on new studies and data, that "use of weighted sleep products on infants can lead to lower oxygen levels, which if sustained, may be harmful to the developing infant's brain."

---

[36] https://publications.aap.org/pediatrics/article/150/1/e2022057990/188304/Sleep-Related-Infant-Deaths-Updated-2022

[37] https://www.cdc.gov/reproductive-health/features/babies-sleep.html?CDC_AAref_Val=https://www.cdc.gov/reproductivehealth/features/baby-safe-sleep/index.html (emphasis in original) (last visited June 13, 2024).

[38] https://www.documentcloud.org/documents/23849624-aap-letter-61523 (last visited June 12, 2024)

47.     In December of 2023, U.S. Senator Richard Blumenthal of Connecticut similarly attempted to raise awareness about the Products and penned letters to the two prominent manufacturers, Dreamland Baby and Nested Bean, requesting answers to a list of questions about product safety and effectiveness. Senator Blumenthal took particular issue with Dreamland's aforementioned claim that its products "exceed all CPSC standards" despite the CPSC lacking any such standards for weighted infant sleep products. He also cited the AAP's recommendations and reports and determined that, "[i]t is clear that there is not yet enough understanding of the impact of weighted sleep products on infants and they should not be marketed as 'safe' especially since medical professionals have expressed such serious concerns."[39]

48.     On April 15, 2024, with calls for regulation or other agency action growing, the CPSC issued an official warning against using weighted sleep products on infants and asked that retailers consider ceasing sale of the Products.[40] In the announcement, Commissioner Richard L. Trumka Jr. cited the fact that the NIH, CDC, and AAP have all warned the public *not* to use the Products. He also quoted Dr. Rachel Moon, the co-chair of the AAP's task force on Sudden Infant Death Syndrome (SIDS), who explained, "[w]hen babies are first born, their rib cage is not rigid, and so it doesn't take a lot of pressure to press on it and create obstruction there. It makes it harder for them to breathe, it makes it harder for their heart to beat properly if there's pressure on there," when speaking to the Washington Post on the dangers of these Products.[41]

---

[39] https://www.blumenthal.senate.gov/newsroom/press/release/blumenthal-raises-serious-concerns-over-weighted-sleep-sacks-and-swaddles-for-infants
[40] https://www.cpsc.gov/About-CPSC/Commissioner/Richard-Trumka/Statement/Beware-Weighted-Infant-Swaddles-and-Blankets-Are-Unsafe-for-Sleep-Retailers-Should-Consider-Stopping-Sales
[41] *Id.*

49.     Shortly after the CPSC published its warning, major retailers Amazon and Target announced they would cease to sell the Products and others like them, citing safety concerns.[42] This decision was applauded by the AAP, which called it a "strong first step."[43] Later in April, Walmart, Nordstrom, and Babylist also joined Amazon and Target in ceasing to sell the Products.[44] Commissioner Trumka praised these retailers for their rapid response to the CPSC's call for action.[45]

50.     On April 25, 2024, Senator Blumenthal wrote a letter to the FTC urging the agency to investigate Dreamland Baby Co. and Nested Bean for their claims that their weighted sleep products were safe, which in light of new evidence, "may constitute unlawful behavior under the FTC's 'unfair or deceptive acts or practices' within the Commission's enforcement authority."[46]

51.     Dreamland nonetheless has declined to retract or modify its safety claims. Instead, Dreamland addressed the AAP's findings through a blog post on its website titled: *Dreamland Baby's Commitment to Safety*.[47]

52.     In this blog post, Dreamland contends that, "its products were designed in collaboration with pediatricians, NICU nurses, and certified sleep consultants and reviewed by a pediatric pulmonologist for breathing safety. The gentle weight is evenly distributed from a baby's

---

[42] https://advocacy.consumerreports.org/press_release/amazon-and-target-will-stop-sales-of-weighted-baby-sleep-sacks-and-weighted-baby-swaddles-due-to-safety-concerns/.
[43] https://publications.aap.org/aapnews/news/28768/AAP-leaders-call-decision-to-pull-harmful-weighted?autologincheck=redirected.
[44] https://www.cpsc.gov/About-CPSC/Commissioner/Richard-Trumka/Statement/Target-Walmart-Nordstrom-and-Babylist-Commit-to-Stop-Selling-Weighted-Infant-Products.
[45] *Id.*
[46] https://www.blumenthal.senate.gov/imo/media/doc/2024-04-25_blumenthal_letter_ftc-dreamland_baby_-nested_bean.pdf.
[47] https://dreamlandbabyco.com/blogs/news/dreamland-baby-s-commitment-to-safety (last visited June 17, 2024).

shoulders to toes, with no concentration of weight in any one area. The sleep sacks are made of 100% cotton, which is naturally breathable and soft against a baby's delicate skin."[48]

53.     Dreamland also attacks the science behind the AAP's findings, citing a lack of data and claiming that it commissioned its own clinical trial with Indiana University. This study, which began in April 2024, "is designed to assess the safety and efficacy of weighted wearable blankets in healthy infants during overnight sleep." And Dreamland is confident that this clinical trial will "confirm the products' safety and effectiveness, and [they] will share the results when they become available."[49] The study's findings almost assuredly will be biased and reach a predetermined outcome.

54.     In the meantime, Defendants' misstatements and omissions have had tragic real-world consequences. Investigative journalists have found, in the CPSC database and in coroners' reports, at least eight incidents in which infants died while wearing weighted sleep products.[50]

55.     Given the weight of evidence and recommendations from scientific authorities such as the AAP and government authorities such as the CPSC, Dreamland's claims about product safety are misleading. Dreamland's use of press coverage and prominent use of experts only serves to mislead reasonable consumers into believing its claims.

56.     Plaintiff and Class members purchased the Products for approximately $90 to $100 – a considerable premium over traditional infant bedding and sleep aids. But for Defendant's material misrepresentations and omissions concerning Product safety, however, neither Plaintiff nor members of the Class would have purchased the Products, which are functionally useless due

---

[48] *Id.*
[49] *Id.*
[50] https://www.wsaz.com/video/2024/06/10/defective-baby-industry-insiders-questioned-over-involvement-with-setting-own-safety-standards/.

to the unreasonable safety risks to which they subject infants and other young children. And in spending $90 to $100 for a product that is dangerous, and thereby worthless, the consumers were damaged.

57.    Thus, Defendant's Product safety claims have harmed Plaintiff and the Class, and will continue to do so until and unless the Products are recalled.

## V.    CLASS ACTION ALLEGATIONS

58.    Plaintiff brings this action on behalf of herself and, pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3), a Class of:

> All persons in the United States who purchased Dreamland Baby Co.'s weighted sleep products for personal use.

Excluded from the Class are Defendant, its executives and officers, and the Judge(s) assigned to this case. Plaintiff reserves the right to modify, change or expand the Class definition after conducting discovery.

59.    Numerosity: Upon information and belief, the Class is so numerous that joinder of all members is impracticable. The exact number and identities of individual members of the Class are unknown at this time, such information being in the sole possession of Defendant and obtainable by Plaintiff only through the discovery process. On information and belief, the number of affected individuals is estimated to be in the millions based on the quantity of products sold by Defendant. The members of the Class will be identifiable through information and records in Defendant's possession, custody, and control.

60.    Existence and Predominance of Common Questions of Fact and Law: Common questions of law and fact exist as to all members of the Class. These questions predominate over

the questions affecting individual Class members. These common legal and factual questions include, but are not limited to:

a.    Whether the weighted sleep products are dangerous for infants and toddlers;

b.    What representations Defendant made regarding its weighted sleep products;

c.    Whether the Class members relief on Defendant's representations in making their purchasing decisions;

d.    Whether the weighted sleep products were fit for their intended purpose;

e.    Whether Defendant breached its express warranty;

f.    Whether Defendant breached its implied warranty;

g.    Whether Defendant retained a benefit at the expense of the Class;

h.    Whether Defendant engaged in misleading and/or unlawful conduct in making certain representations about its weighted sleep products;

i.    What damages Plaintiff and Class members suffered as a result of Defendant's misconduct; and

j.    Whether Plaintiff and Class members are entitled to actual and/or statutory damages.

61.    Typicality: Plaintiff's claims are typical of the claims of the Class as Plaintiff and all members of the Class purchased Defendant's product. Plaintiff's claims and damages are also typical of the Class because they resulted from Defendant's uniform wrongful conduct. Likewise, the relief to which Plaintiff is entitled to is typical of the Class because Defendant has acted, and refused to act, on grounds generally applicable to the Class.

62.    Adequacy: Plaintiff is an adequate class representative because Plaintiff's interests do not materially or irreconcilably conflict with the interests of the Class she seeks to represent, Plaintiff has retained counsel competent and highly experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously. Plaintiff and counsel will fairly and

adequately protect the interests of the Class. Neither Plaintiff nor Plaintiff's counsel have any interests that are antagonistic to the interests of other members of the Class.

63.    <u>Superiority</u>: Compared to all other available means of fair and efficient adjudication of the claims of Plaintiff and the Class, a class action is superior. The injury suffered by each individual Class member is relatively small in comparison to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendant's conduct. It would be virtually impossible for members of the Class individually to effectively redress the wrongs done to them. Even if the members of the Class could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties and to the court system presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Members of the Class can be readily identified and notified based on, *inter alia*, Defendant's records and databases.

## VI.    CAUSES OF ACTION

### COUNT I
### Breach of Express Warranty

64.    Plaintiff incorporates and realleges all allegations above as if fully set forth herein.

65.    Plaintiff brings this claim on behalf of herself and the members of the Class.

66.    A seller who makes an affirmation of fact or promise that relates to a good or service creates an express warranty that the good or service will conform to that affirmation or promise. Likewise, a seller who provides a description of a good or service creates an express warranty that the good or service will conform to that description.

67.     Defendant Dreamland's product labels and packaging expressly warrant that its weighted sleep products were "Safety Certified," "Doctor Approved," and that they "[p]assed all safety testing and additional non-required testing."

68.     Defendant Dreamland's website expressly warrant that its products "exceeded all United States Consumer Product Safety Commission standards," made from "only the best materials for ultimate comfort and safety," and "are rigorously tested with both required and non-required testing." Defendant's website further made the affirmation of fact and/or promise that it, "ensure[s] high quality standards and safety in every aspect of [its] products."

69.     Defendant Dreamland's website also expressly warranted that Dreamland had, "pulled research from [a] clinical study demonstrating that weighted blankets are safe for newborns."

70.     Defendant Dreamland's representations became part of the benefit of the bargain between Defendant, Plaintiff, and Class members and created collective express warranties that the weighed sleep products would conform to Defendant's aforementioned representations and affirmations.

71.     Plaintiff and the Class had reasonably relied on Defendant's statements. Further, reliance can be inferred as the express warranties were made regarding a material aspect of the products: their safety for use by children.

72.     Defendant breached its express warranties by supplying products in a condition that did not satisfy its obligations. For example, the Products were *not* safe for use by infants and the products *could not* have met or exceeded "all CPSC standards" as such standards for weighted sleep products still do not exist.

73.    Plaintiff has complied with the warranty terms, including using the Products in accordance with Defendant's instructions.

74.    Plaintiff and the Class were damaged by Defendant's conduct because they would not have purchased the Products without these express warranties, *i.e.,* had Defendant not described them as being safe, and ultimately received a worthless product (as described in detail above).

75.    Plaintiff provided Defendant with notice of this breach of express warranty via certified mail on June 24, 2024. Defendant Dreamland also had notice of its breach based on multiple scientific, media, and regulatory reports going all the way back to 2022.

<u>**COUNT II**</u>
**Breach of Implied Warranty of Merchantability**

76.    Plaintiff incorporates and realleges all allegations above as if fully set forth herein.

77.    Plaintiff brings this claim on behalf of herself and the members of the Class.

78.    A seller who is a merchant with respect to the sale of a product implies a warranty of merchantability in the products they sell. *See* Uniform Commercial Code Sec. 2-314 ("a warranty that . . . goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." Goods are considered merchantable if they are "fit for the ordinary purposes for which the goods are used." *See Id.*

79.    Defendant Dreamland is a merchant of the Products; therefore, a warranty of merchantability was implied with every such product it sold.

80.    However, these Products were inherently unsafe to use as they, *inter alia*, may deprive oxygen to the brains of infants and toddlers with multiple government agencies and medical organizations warning consumers against their use. Since these Products were unsafe to use, even when used in the manner envisioned by Defendant, they were *never* merchantable.

81.     Because the Products are not merchantable, Defendant Dreamland breached its implied warranty and Plaintiff and the Class were harmed by this breach because they would not have purchased a product that was unsafe for their children and they purchased an ultimately worthless product for substantial sums of money.

82.     Plaintiff provided Defendant with notice of this breach of implied warranty via certified mail on June 24, 2024. Defendant Dreamland also had notice of its breach based on multiple scientific, media, and regulatory reports going all the way back to 2022.

## COUNT III
### Quasi Contract/Restitution

83.     Plaintiff incorporates and realleges all allegations above as if fully set forth herein.

84.     Plaintiff brings this claim on behalf of herself and the members of the Class.

85.     As alleged above, Defendant made misleading statements and representations about both the safety and the usefulness of its Products with the intent that these statements induce the Plaintiff and Class members into purchasing them.

86.     As alleged above, Plaintiff and the Class members reasonably relied on Defendant's misleading statements and representations and were thus induced by these statements to purchase the Products.

87.     In purchasing the Products, Plaintiff and the Class conferred a benefit on the Defendant by paying money. However, these Products were not safe to use in their primary purpose. As such, Plaintiff and the Class did not receive the full value of the benefits they were promised in return.

88.     Thus, Defendant retains a benefit at the expense of the Plaintiff and Class members through unjust and unfair circumstances it created. It is inequitable for Defendant to retain these benefits at the expense of the Plaintiff and Class members.

89.     Plaintiff and Class members are entitled to, and seek, restitution, disgorgement, and other remedial measures to the benefits, profits, and other compensation acquired by Defendant from its misleading and unlawful conduct.

**COUNT IV**
**Violation of the California Consumer Legal Remedies Act ("CLRA")**
**California Civil Code § 1750, *et seq.***

90.     Plaintiff incorporates and realleges all allegations above as if fully set forth herein.

91.     Plaintiff brings this claim on behalf of herself and the members of the Class

92.     Cal. Civ. Code § 1770(a)(5) prohibits "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have…" Defendant violated, and continues to violate, this section by representing that its Products are safe for infants when they are not safe to wear.

93.     Cal. Civ. Code § 1770(a)(7) prohibits "[r]espresenting that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another." Defendant violated, and continues to violate, this section by representing that its Products are safe for infants when they are not safe to wear. This is particularly the case with Defendant's 2023 representations that its Products complied with CPSC standards when no such standards for this category of products existed.

94.     Cal. Civ. Code § 1770(a)(9) prohibits "[a]dvertising goods or services with intent not to sell them as advertised." Defendant violated, and continues to violate, this section by representing that its Products are safe for infants when they are not safe to wear. Defendant knew when it made these representations that it lacked enough evidence to support its claims as, for example, it did not begin a clinical trial of the Products until 2023. Thus, it intended to sell its products to consumers without knowing whether they were safe or effective.

95.     Cal. Civ. Code § 1770(a)(9) prohibits "[r]epresenting that the subject of a transaction has been supplied in accordance with a previous representation when it has not." Defendant violated, and continues to violate, this section by representing that its Products are safe for infants when they are not safe to wear.

96.     Defendant Dreamland knew or should have known its representations were false and/or misleading based on the sizable (and growing) weight of evidence publicly questioning the safety of its products. It similarly knew that it lacked sufficient scientific proof to support its claims as it grossly delayed in launching a clinical trial.

97.     As described above, Plaintiff and Class members reasonably relied on Defendant's representations. Furthermore, claims about safety (particularly for a product intended for infants and toddlers) is always considered material and thus reliance may be inferred.

98.     Plaintiff and the Class continue to suffer damages, directly and proximately caused by Defendant's conduct, as they are stuck with a worthless product for which they paid substantial sums of money.

99.     On June 24, 2024, Plaintiff provided Defendant with notice of its violations of the CLRA pursuant to Cal. Civ. Code § 1782(a), and thus seek only injunctive relief at this time. If corrective action and relief is not forthcoming after 30-days, Plaintiff intends to amend this Complaint to seek monetary damages, including actual, restitutionary, and punitive damages.

<u>**COUNT V**</u>
**Violation of the California False Advertising Law ("CFAL")**
**Cal. Bus. & Prof. Code § 17500, *et seq.***

100.    Plaintiff incorporates and realleges all allegations above as if fully set forth herein.

101.    Plaintiff brings this claim on behalf of herself and the members of the Class.

102.    Cal. Bus. & Prof. Code § 17500 makes it "unlawful for any person to make or disseminate or cause to be made or disseminated before the public . . . in any advertising device . . . or in any other manner or means . . . any statement, concerning . . . personal property or services professional or otherwise, or performance or disposition thereof, which is untrue or misleading and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

103.    Defendant Dreamland flagrantly violated the CFAL by advertising that its Products were safe to use.

104.    Defendant Dreamland knew or should have known that its Products were  unsafe for use, based on the weight of publicly available evidence and its own lack of scientific studies.

105.    Plaintiff and the Class reasonably relied on Defendant's advertisements in making their decision to purchase these Products, though reliance can be inferred as safety of the product is necessarily material to the consideration.

106.    Plaintiff and the Class were damaged by Defendant's false advertising as it induced them to purchase, for a substantial sum of money, a product that is worthless. But for the misleading advertisements, Plaintiff and the Class *would not* have purchased Defendant's products as no parent would knowingly spend substantial sums of money on a product that could harm their infant.

### COUNT VI
**Violation of California's Unfair Competition Law ("UCL")**
**California Business & Professions Code § 17200, *et seq.***

107.    Plaintiff incorporates and realleges all allegations above as if fully set forth herein.

108.    Plaintiff brings this claim on behalf of herself and the members of the Class

109.    Cal. Bus. & Prof Code § 17200 defines "unfair competition" as "unlawful, unfair, or fraudulent business practices and unfair, deceptive, untrue or misleading advertising . . ."

110.    Under the UCL, conduct is considered "unlawful" if it violates any state or federal law. Defendant engaged in unlawful conduct under the UCL by engaging in conduct that violated the CLRA and CFAL, as alleged in Counts V and VI.

111.    Under the UCL, conduct is considered "fraudulent" if it actually deceives or is likely to deceive members of the consuming public. Defendant engaged in fraudulent conduct under the UCL because it represented that its Products were safe when it knew or should have known they were not. And its customers (the Plaintiff and the Class) relied on these representations in making their purchasing decisions.

112.    Under the UCL, conduct is considered "unfair" if it offends established public policy, if it is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers, or if it has an impact on the victim that outweighs defendant's reasons, justifications, and motives for the practice. As is evident from the strong public and regulatory response, the manufacture and sale of products, intended for infants and young children, that are unsafe clearly offends public policy and represent a clear danger to public safety. And, as the weight of publicly available evidence suggests that the products are not even effective at improving infant and toddler sleep, the threat to public safety is clearly not outweighed by any benefit to the consumer. There is a similar lack of any business justification for selling such an unsafe product.

113.    Defendant intended for its unlawful, unfair, and fraudulent conduct to induce Plaintiff and the Class into purchasing its Products and Plaintiff and the Class did rely on Defendant's conduct. However, since the safety of a product intended for infants are always material considerations, reliance can be inferred on the Class.

114.    Defendant's unlawful, unfair, and fraudulent conduct damaged Plaintiff and the Class as they purchased a worthless product for a substantial sum of money.

**COUNT VII**
**Violation of Additional State Consumer Protection Statutes**

115.    Plaintiff incorporates and realleges all allegations above as if fully set forth herein.

116.    Plaintiff and Class members are "consumers" as defined in the relevant state consumer protection statutes.

117.    Defendant is a "person" as defined in the relevant state consumer statutes.

118.    Defendant's conduct as described occurred as part of "trade and commerce" as described by the relevant state consumer statutes.

119.    Defendant is engaged in "trade and commerce" as defined by the relevant state consumer statutes and Defendant's acts and omissions as described affect "trade and commerce" as defined by the relevant state consumer statutes.

120.    Defendant's acts, practices and omissions were done in the course of Defendant's business of marketing, facilitating, offering for sale, and selling goods and services throughout the United States.

121.    Defendant's unlawful, unfair, deceptive, fraudulent and/or unconscionable acts and practices include:

      a.    Advertising or otherwise representing that its Products were safe;

      b.    Implying or suggesting that its Products had scientific or medical backing;

122.    By engaging in such conduct and omissions of material facts, Defendant has violated state consumer laws prohibiting representing that "goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have," representing that "goods and services are of a particular standard, quality or grade, if they are of

33

another", and/or "engaging in any other conduct which similarly creates a likelihood of confusion or of misunderstanding"; and state consumer laws prohibiting unfair methods of competition and unfair, deceptive, unconscionable, fraudulent and/or unlawful acts or practices.

123.    Defendant's representations and omissions were material because they were likely to deceive reasonable persons about the safety of its products.

124.    Defendant intentionally, knowingly, and maliciously misled Plaintiff and Class members and induced them to rely on its misrepresentations and omissions.

125.    Had Defendant disclosed that its products were not safe, Plaintiff and the Class would never have purchased its products.

126.    Defendant knew or should have known that its products were not safe for use by infants and toddlers, due to the breadth of publicly available evidence on the topics and its own lack of scientific testing.

127.    Plaintiff and the Class members were damaged by Defendant's conduct because they purchased a worthless product for substantial sums of money and the harm they suffered outweighed any utility to themselves, Defendant, or the public at large.

128.    Defendant's conduct described herein constitute unfair methods of competition and unfair, deceptive, unconscionable, fraudulent and/or unlawful acts or practices in violation of the following state consumer statutes:

   a.    The Alabama Deceptive Trade Practices Act, Ala. Code § 8-19-5(5), (7) and (27), *et seq.*;

   b.    The Arizona Consumer Fraud Act, A.R.S. § 44-1522;

   c.    The Arkansas Deceptive Trade Practices Act, Ark. Code Ann. §§ 4-88-107(a)(1)(10) and 4-88-108(1)(2), *et seq.*;

   d.    The Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110(b), *et seq.*;

e.  The Delaware Deceptive Trade Practices Act, Del. Code Ann. Title 6, § 2532(5) and (7), *et seq.*, and the Delaware Consumer Fraud Act, Del. Code Ann. Title 6 § 2513, *et seq.*;

f.  The Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. Ann. § 501.204(1), *et seq.*;

g.  The Georgia Fair Business Practices Act, Ga. Code Ann. §§ 10-1-393(a) and (b)(2), (5) and (7), *et seq.*;

h.  The Hawaii Deceptive Trade Practices Act, Haw. Rev. Stat. Ann. §§ 481A-3(a)(5), (7) and (12), *et seq.*; and the Hawaii Consumer Protection Act, Haw. Rev. Stat. Ann. § 480-2(a), *et seq.*;

i.  The Idaho Consumer Protection Act, Idaho Code §§ 48-603(5), (7), (17) and (18), *et seq.*; and Idaho Code § 48-603C, *et seq.*;

j.  The Illinois Consumer Fraud and Deceptive Trade Practices Act, 815 Ill. Stat. § 505/2, *et seq.*;

k.  The Indiana Deceptive Consumer Sales Act, Ind. Code §§ 24-5-0.5-3(a) and (b)(1) and (2), *et seq.*;

l.  The Iowa Consumer Fraud Act, I.C.A. §§ 714H.3 and 714H.5, *et seq.*;

m.  The Kansas Consumer Protection Act, Kan. Stat. §§ 50-626(a) and (b)(1)(A)(D) and (b)(3), *et seq.*;

n.  The Kentucky Consumer Protection Act, K.R.S. § 367.170(1) and (2), *et seq.*;

o.  The Louisiana Unfair Trade Practices and Consumer Protection Law, La. Rev. Stat. Ann. § 51:1405(A), *et seq.*;

p.  The Maine Uniform Deceptive Trade Practices Act, 10 M.R.S.A. §§ 1212(1)(E) and (G), e*t seq.*, and the Maine Unfair Trade Practices Act, 5 M.R.S.A. § 207, *et seq.*;

q.  The Maryland Consumer Protection Act, Md. Code Commercial Law, § 13-301(1) and (2)(i), and (iv) and (9)(i), *et seq.*;

r.  The Massachusetts Consumer Protection Act, Ma. Gen. Laws Ann. Ch. 93A § 2(a), *et seq.*;

s.  The Michigan Consumer Protection Act, M.C.P.L.A. § 445.903(1)(c)(e),(s) and (cc), *et seq.*;

t.    The Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.44, subd. 1(5), (7) and (13), et seq., the Minnesota Consumer Fraud Act, Minn. Stat. § 325F.69, subd. 1, and Minn. Stat. § 8.31, subd. 3(a);

u.    The Mississippi Consumer Protection Act, Miss. Code Ann. §§ 75-24-5(1), (2)(e) and (g), *et seq.*;

v.    The Missouri Merchandising Practices Act, Mo. Ann. Stat. § 407.020(1), *et seq.*;

w.    The Montana Unfair Trade Practices and Consumer Protection Act, MCA §§ 30-14-103, *et seq.*;

x.    The Nebraska Consumer Protection Act, Neb. Rev. Stat. § 59-1602, and the Nebraska Uniform Deceptive Trade Practices Act, Neb. Rev. Stat. § 87-302(a)(5) and (7), *et seq.*;

y.    The Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. Ann. § 598.0915(5) and (7), *et seq.*;

z.    The New Hampshire Consumer Protection Act, N.H. Rev. Stat. Ann. § 358-A:2(v) and (vii), *et seq.*;

aa.    The New Jersey Consumer Fraud Act, N.J. Stat. Ann. § 56:8-2, *et seq.*;

bb.    The New Mexico Unfair Practices Act, N.M. Stat. Ann. §§ 57-12-2(D)(5)(7) and (14) and 57-12-3, *et seq.*;

cc.    New York Business Law, N.Y. Gen. Bus. Law § 349(a);

dd.    The North Carolina Unfair Trade Practices Act N.C.G.S.A. § 75-1.1(a), *et seq.*;

ee.    The North Dakota Unlawful Sales or Advertising Practices Act, N.D. Cent. Code § 51-15-02, *et seq.*;

ff.    The Ohio Consumer Sales Practices Act, Ohio Rev. Code Ann. § 1345.02(A) and (B)(1) and (2), *et seq.*;

gg.    The Oklahoma Consumer Protection Act, 15 Ok. Stat. Ann. § 753(5), (7) and (20), *et seq.*; and the Oklahoma Deceptive Trade Practices Act, 78 Ok. Stat. Ann. § 53(A)(5) and (7), *et seq.*;

hh.    The Oregon Unfair Trade Practices Act, Or. Rev. Stat. § 646.608(1)(e)(g) and (u), *et seq.*;

ii.    The Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. §§ 201-2(4)(v)(vii) and (xxi), and 201-3, *et seq.*;

jj.     The Rhode Island Deceptive Trade Practices Act, R.I. Gen. Laws § 6-13.1-1(6)(v), (vii), (xii), (xiii) and (xiv), *et seq.*;

kk.     The South Carolina Unfair Trade Practices Act, S.C. Code Ann. § 39-5-20(a), *et seq.*;

ll.     The South Dakota Deceptive Trade Practices Act and Consumer Protection Act, S.D. Codified Laws § 37-24-6(1), *et seq.*;

mm.    The Alabama Consumer Protection Act, Tenn. Code Ann. §§ 47-18-104(a) and (b)(5) and (7);

nn.     The Texas Deceptive Trade Practices- Consumer Protection Act, V.T.C.A., Bus. & C. § 17.46(a), (b)(5) and (7), *et seq.*;

oo.     The Utah Consumer Sales Practices Act, Utah Code Ann. §§ 13-11-4(1) and (2)(a) and (b);

pp.     The Vermont Consumer Fraud Act, 9 V.S.A. § 2453(a), *et seq.*;

qq.     The Virginia Consumer Protection Act, Va. Code Ann. § 59.1-200(A)(5)(6) and (14), *et seq.*;

rr.     The Washington Consumer Protection Act, Wash. Rev. Code § 19.86.020, *et seq.*;

ss.     The West Virginia Consumer Credit and Protection Act, W.V.A. Code § 46A-6-104, *et seq.*;

tt.     The Wisconsin Deceptive Trade Practices Act, W.S.A. § 100.20(1), *et seq.*; and

uu.     The Wyoming Consumer Protection Act, Wyo. Stat. Ann. § 40-12-105(a), (i), (iii) and (xv), *et seq.*

129.    Plaintiff and Class members seek all monetary and non-monetary relief allowed by law, including actual or nominal damages; injunctive relief, including an injunction barring Defendant from continuing to engage in the conduct complained of herein; reasonable attorneys' fees and costs; and any other relief that is just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually, and on behalf of all members of the Class, respectfully requests that the Court enter judgment in her favor and against Defendant, as follows:

A.    That the Court certify this action as a class action, proper and maintainable pursuant to Rule 23 of the Federal Rules of Civil Procedure; declare that Plaintiff is a proper class representative; and appoint Plaintiff's Counsel as Class Counsel;

B.    That the Court grant permanent injunctive relief to prohibit Defendant from continuing to engage in the unlawful acts, omissions, and practices described herein;

C.    That the Court award Plaintiff and Class members compensatory, consequential, and general damages in an amount to be determined at trial;

D.    That the Court award Plaintiff and Class members statutory damages, and punitive or exemplary damages, to the extent permitted by law;

E.    That the Court award to Plaintiff the costs and disbursements of the action, along with reasonable attorneys' fees, costs, and expenses;

F.    That the Court award pre- and post-judgment interest at the maximum legal rate;

G.    That the Court award grant all such equitable relief as it deems proper and just, including, but not limited to, disgorgement and restitution; and

H.    That the Court grant all other relief as it deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff, individually and on behalf of the putative Class, demands a trial by jury on all issues so triable.

Date: June 24, 2024

Respectfully Submitted,

By: **BAILEY & GLASSER LLP**

_____/s/ Arthur Bryant_____
Arthur Bryant (SBN 208365)
1999 Harrison Street, Suite 660
Oakland, CA 94612
T: 510.272.8000
F: 510.463.0291
abryant@baileyglasser.com

Bart D. Cohen, Esq.
1622 Locust Street
Philadelphia, PA 19103
(215) 274-9420
bcohen@baileyglasser.com

Nyran R. Rasche (_pro hac vice_ anticipated)
Alex Lee (_pro hac vice_ anticipated)
**CAFFERTY CLOBES MERIWETHER & SPRENGEL LLP**
135 S. LaSalle, Suite 3210
Chicago, Illinois 60603
Telephone: (312) 782-4880
Facsimile: (312) 782-4485
nrasche@caffertyclobes.com
alee@caffertyclobes.com